FILED
SUPERIOR COURT
OF GUAM

2023 JUN 14 AM 9: 37

CLERK OF COURT

BY: _____

**IN THE SUPERIOR COURT OF GUAM**

| | |
|---|---|
| ALLAIN RODRIGUEZ, | Superior Court Case No. **DM0066-20** |
| Petitioner, | |
| vs. | **DECISION AND ORDER RE MOTION TO MODIFY CUSTODY AND FOR CONTEMPT** |
| MARY C. MANIBUSAN, | |
| Defendant. | |

The Court here considers Plaintiff Allain Rodriguez's Motion to Modify Custody and for Contempt. The Court received testimony from Defendant Mary Manibusan, Allain, Maria Rodriguez, E.P.,[1] and Pulani Peredo during the motion hearing held on November 14, December 9, 19, and 28, 2022, and January 9, February 24, and 28, 2023.

After reviewing the record, briefs, testimony, and evidence, the Court finds the parties to be incapable of co-parenting and that Mary has exhibited unsettling behavior concerning the children's health and Allain's parental and custodial rights. The Court therefore determines it is in the best interests of the parties' children to be placed under Allain's sole physical and legal custody, and GRANTS the motion to modify custody. Additionally, the Court DENIES Allain's Motion for Contempt, finding no basis to impose contempt.

## I.  PROCEDURAL BACKGROUND

Allain initiated this case seeking to annul his marriage to Mary. Compl. Annulment (Feb. 11, 2020). He alleged that when they married, Mary was still married to someone else. *Id.* ¶ 3.

---

[1] The Court granted this witness's request to shield his identity from publication in this Decision and Order.

ORIGINAL

Mary consented to the annulment and admitted the allegation of bigamy.[2] *See* Compl., Ex. A (Mary stipulates that she "told plaintiff that she was divorced from Joseph B. Peredo when she married plaintiff in April of 2018, which she knew was not true."); J. Annulment of Void Marriage (Mar. 5, 2020).

The parties also entered a Marital Settlement Agreement and Consent to Annulment ("MSA"). *See* Compl., Ex. A. Under the MSA, the parties had joint legal custody of their two minor children, with Mary exercising primary physical custody while Allain was on military duty in South Korea at the time. The MSA provided Allain with visitation when he was on island; while off-island, the MSA allowed Allain telephonic visitation and his parents visitation once a month. Finally, the MSA required Allain to pay $1500 ($750 per child) monthly in child support. The parties later executed an Addendum that reduced the child support to $1200 per month ($600 per child). Compl., Ex. A Addendum. The Judgment of Annulment of Void Marriage approved and incorporated the terms of the MSA and its Addendum into its Judgment.

After the annulment, Mary changed the name of their daughter, C.X.M.R.[3] Allain moved for contempt asserting that Mary violated the MSA by unilaterally changing C.X.M.R.'s name. On April 29, 2021, the Court granted Allain's Motion, found Mary in contempt of court for changing C.X.M.R.'s name without Allain's consent, and ordered her to immediately restore C.X.M.R. to her original name. Dec. and Order Re Mots. Contempt and Modification of Child Support and Custody (Apr. 29, 2021). The Court also reinstated the child support amount of $1,500 per month. *Id.* at 10.

---

[2] Mary claims that she was forced to sign the MSA. However, she was represented by counsel when she signed it and was represented by counsel during the earlier contempt hearing.

[3] C.X.M.R. is now three years old.

On January 21, 2022, the Child Support Referee reviewed the issue of child support arrears. In her order, the referee found that "Mother claimed she never received [child support payments]. When confronted with the evidence that she received payments in the amount of child support, she tried characterizing these amounts as 'gifts' not child support. Mother did not give any credible reason why Father would give her 'gifts' in the same amounts as his child support obligation." Finds. Fact & Concls. Law (May 2, 2022). The referee held that Allain owed $309 in arrears and ordered the remaining balance held by the Office of the Attorney General be released to Allain.

Currently, Allain brings a Motion to Modify Custody and Motion for Contempt. The Motion for Contempt is based on Mary's failure to restore C.X.M.R.'s name as ordered in this Court's April 29, 2021 Decision. The Motion to Modify Custody is based on Allain's relocation to the mainland. He is no longer employed with the Department of Defense, is a private citizen residing in Colorado, and wishes to have exclusive physical custody with limited supervised visitation for Mary. Additionally, Allain alleges that Mary has prevented him from having regular communication with his children while he was off-island, and did not permit visitation while he was on-island. Further, Allain expresses concerns regarding the children's safety based on L.R.M.R.'s behavioral issues, unfounded abuse allegations targeted at him, and Mary's assertions that C.X.M.R. has cancer. Mary opposes Allain's Motion and also seeks sole physical and legal custody. She cites Allain's record of not paying child support, and claims he has abused or neglected the children and abused her.

As part of this proceeding, both parties presented social studies. Mary's home study was conducted by the Guam Department of Public Health and Human Services. DPHSS reported that Mary is temporarily living in a home owned by her uncle with her adult daughter, Pulani, and the two minors. Additionally, the study noted that Mary is currently unemployed, and her monthly

ORIGINAL

income consists of $1,500 in child support and $500 in unearned income from her mother. Finally, DPHSS noted the children appear to be developing appropriately in Mary's care, and Mary "has the capacity to provide the continued level of care" that the children require. Ex. 19.

Allain's social study was conducted in Colorado by a retained expert.[4] Ex. 20. Allain is now married to Maria Rodriguez and both are employed. They own a residence where they live with Maria's two teenaged daughters. Allain's stepdaughters view him as a father figure. Allain also has two adult daughters and three grandchildren whom he maintains a close relationship with. The Colorado study concluded that Allain can provide suitable housing and a loving home for the children.

After Mary repeatedly accused Allain of failing to pay child support during this motion hearing, the Court referred the matter to the Child Support Referee. At an April 10, 2023 hearing, the Assistant Attorney General informed the court that Allain's checks were indeed being garnished and issues with payment were beyond his control. For an unknown reason, his checks have only been garnished $1,433.39–not the full $1,500. Allain informed the court that he is willing to submit the additional $77 directly to Mary.

## II.    FINDINGS OF FACT

The Court makes the following findings by the standard of a preponderance of the evidence:

**The parties' relationship and children.**

1. The parties married in April 2018 while residing in Texas, where Allain was stationed with the U.S. Army.

---

[4] A DPHSS study was not an option due to his off-island residency.

ORIGINAL

2. On July 30, 2018, Joe Peredo, the father of Mary's oldest child, passed away. Allain then learned that Mary and Joe, who were married in 2005, remained legally married, despite Mary having told Allain she was divorced.

3. On August 14, 2018, Mary gave birth to L.R.M.R., the parties' oldest child.

4. Mary returned to Guam while pregnant with the couple's second child and gave birth to C.X.M.R. on January 13, 2020. Although present on Guam and at the hospital for C.X.M.R.'s birth, Allain was unable to be present for the birth itself due to a no-contact order issued to him by the Army and for Mary's protection.

5. L.R.M.R. is now school-aged and enrolled in a Head Start program. Mary is C.X.M.R.'s full-time caregiver.

**Evidence regarding the children's health.**

6. Mary testified that Allain abused L.R.M.R. by holding him upside down, damaging his eye. No medical evidence was provided to support this statement.

7. Mary also testified that Allain sexually abused L.R.M.R. during a visitation in January 2020. To support this allegation, Mary claims that upon L.R.M.R.'s return from the visitation he was "insane," and Allain refused her requests to assist her in calming L.R.M.R. down. Mary testified that she took L.R.M.R. to the pediatrician after this incident, and the pediatrician found no indication of sexual abuse.

8. Mary has taken L.R.M.R. to the pediatrician for behavioral issues based on her belief that he is a victim of abuse and trauma by Allain. From these visits, Mary has been provided with two referrals for behavioral services. Exs. 12, 13. Although Mary has had these referrals since 2020, she has not engaged behavioral services for L.R.M.R. Mary believes she understands her children and can support L.R.M.R.'s behavioral health on her own.

ORIGINAL

9. Mary has sent out public messages insinuating that C.X.M.R. has cancer. One such posting appeared to attach a photo taken from an airplane looking over Guam and stated: "Can i buy life insurance for a baby or a toddler with a medical condition . . . My children are leaving Guam. Prayer to my baby []. Cancer choose their wrong princess." Ex. 14.

10. Later, Mary sent a message stating "Her battle is my battle. Be strong my baby [C.X.M.R.] everyone is praying for you. Together we shall beat this! #Acute lymphoblastic leukemia." Ex. 17. However, Mary was unable to present any evidence that C.X.M.R. has ever received such a diagnosis.

11. C.X.M.R. was seen at the SDA clinic on May 11, 2022, based on a "a concern that Naval Hospital has not address[ed] the child's leukemia." GAL Report, attach. 3 (Mar. 16, 2023). However, the clinic noted that the child did not have a diagnosis of leukemia and upon conducting their own testing, the doctor did not note concerns regarding leukemia. GAL Report, attach. 3.

12. In September 2020, Mary published messages indicating that L.R.M.R. was in the hospital with COVID and on a ventilator. She informed Allain's Commander that she intended to sign a do not resuscitate order for the child.

13. Mary emailed Allain, "Prayers to him. This is how close I can get." Ex. 37. The email contained a photograph of a child in a hospital bed with his face covered by an emoji. Ex. 37.

14. Mary also sent two messages to Courtney Scott, the parties' mutual friend, stating that L.R.M.R. had COVID, was "severely sick" and "on a ventilator." Exs. 34, 35. Mary remarked about removing the ventilator to "see if he can breathe on his own." Ex. 34. One

ORIGINAL

of the messages included the same hospital photo sent to Allain without an emoji on the child's face. Ex. 35.

15. The image sent by Mary of L.R.M.R. in a hospital bed was not a photo of L.R.M.R. The image is available on Google by searching "Asian boy in hospital." Ex. 39. There was no evidence that L.R.M.R. was ever in such a condition.

**Mary's allegations against Allain.**

16. Around the same time that Allain learned of Mary's marriage to Joe, Mary reported Allain to the military for domestic violence, assault by strangulation or suffocation, sexual assault, and aggravated assault. The military investigation determined that no probable cause existed to believe Allain committed the alleged offenses. Ex. 48 at 5. Moreover, the military report noted that the injury photographs provided by Mary were identical to photographs located on the internet. Ex. 48 at 6.

17. The military issued a no-contact order on September 22, 2020. Ex. 25. The no-contact order forbade Allain from contacting or communicating with Mary. Ex. 25. This order provided that it would remain in effect until rescinded by the military. Ex. 25.

18. After returning to Guam from Texas, Mary called a police department in Texas and filed a domestic violence complaint against Allain. No action resulted from this report.

19. In relation to Mary's statements accusing Allain of assault, Allain presented evidence regarding a prior false allegation made by Mary. Ex. 31. During this proceeding, both Mary and E.P. testified that E.P. never raped her.

20. On October 20, 2020, Mary wrote two emails to Army Captain Finis Garrett. The first stated: "I might well take my life and my children for justice will never come. . . . Be prepared for what going to happen cause I'm tired of being abuse and seeing my children

ORIGINAL

be abuse by him." Ex. 5 at 1. The second stated: "I'm taking my life and my children's life to start the healing process of what allain did you me and children. Like I said watch and see what will happen next." Ex. 5 at 2.

21. Pulani testified that she never witnessed Allain physically abuse Mary. However, Pulani testified that she believed Allain abused Mary by failing to give her foot massages while she was pregnant.

22. Mary reported Allain to the military for OHA fraud. The military determined that Allain executed a fraudulent lease, costing the military a total of $28,894.95. Allain was disciplined by the military for his actions. Ex. C at 1.

23. In Allain's response to the Guardian ad Litem report filed in this proceeding on April 17, 2023, he informed the Court that Mary has contacted his wife's command to "report[] and complain[]" that she "should not be able to carry the children under her health insurance plan." Resp. GAL Report ¶ 3 (Apr. 17, 2023). Mary believes the children should be on health insurance plan provided by Allain—not under his wife's employment.

**Allain and his parents' visitation with the children.**

24. When Allain is on-island, Mary does not allow Allain to see the children as provided by the MSA. The last time Allain was on-island, Mary allowed Allain to exercise visitation once. Due to the time constraints, Allain requested to spend time with L.R.M.R. whom he was able to have a relationship with prior to the annulment.

25. Due to the no-contact order issued by the Army, Allain was unable to exercise telephonic visitation with the children while he was active duty as the children's ages prevented them from independent communication.

ORIGINAL

26. Since Allain left the Army, he has still be unable to exercise telephonic visitation with the children. Allain testified that Mary interferes with the visitation and will not utilize telephonic visitation applications. Mary testified that Allain does not call the children, and she does not have a smart phone to use such an application.[5]

27. Mary has not allowed grandparent visitation pursuant to the MSA. On one occasion, Mary bought the children to Allain's mother's place of employment for a visitation. Mary did not inform Allain's mother that she would be coming for a visitation, and Mary was upset that Allain's mother did not stop working during her shift to spend time with the children.

28. Mary testified that the children are "not [Allain's parent's] grandchildren." Mary also sent messages of the same sentiment to Allain's mother stating that "I'm done visiting you," "they have better grandparents than you," and "you're just mrs. Anderson to these kids." Exs. 3, 4.

29. The children's last visit with their grandparents occurred in November of 2020. Mary testified that they stopped visiting the grandparents because they were "so busy" and the grandparents didn't show the children love.

## III.   ANALYSIS

### A.  Motion to Modify Custody

#### 1.  The Court finds a change in circumstances justifies a modification of custody.

A court may modify a custody arrangement whenever "the best interests of the child require or justify such modification." 19 GCA § 8404(a)(6); *Lanser v. Lanser*, 2003 Guam 14 ¶ 9. "[T]o justify ordering a change in custody there must generally be a persuasive showing of changed

---

[5] The entirety of the Court's hearing was held by Zoom.

circumstances affecting the child." *Lanser*, 2003 Guam 14 ¶ 9 n.2 (citing *In re Marriage of Carney*, 598 P.2d 36, 38 (Cal.1979)).

The parties executed the MSA and its provisions placing primary physical custody with Mary when Allain was about to move to a new unaccompanied duty station. As the children could not live with him at his new duty station, at the time, Allain could not assume any type of primary custodial role. Since then, Allain has left the Army, moved to Colorado, married Maria, and established his post-military life. As Allain is now in a position where he can, and wants to, assume custody of the children, a change in circumstances has occurred.

## 2.  A joint custody agreement is not in the best interests of the children.

Guam law prefers joint physical and legal custody. 19 GCA § 8404(a)(8); *Howerton v. Howerton*, 2004 Guam 8 ¶ 14. However, this preference is secondary to the best interests of the children. *Flores v. Cruz*, 1998 Guam 30 ¶ 12; 19 GCA § 8404(a)(1). "[A]bsent minimal cooperation," a joint custody agreement is not in the best interests of the child as it would "only enhance family chaos." *Palomo v. Bustamonte*, 2019 Guam 5 ¶ 37 (citing *Flores*, 1998 Guam 30 ¶ 20–21). Additionally, when determining what is within the child's best interests, the Court may consider a multitude of factors, including what is best for that child's moral, physical, mental, and spiritual well-being. 19 G.C.A. § 8404; *see also Howerton v. Howerton*, 2004 Guam 8 ¶ 25 (providing additional factors to weigh in a custody decision, such as the child's age, habits, schooling, and extracurricular activities, and the . . . parents' jobs and fitness).

The two respective custody studies advise the Court that both parents are fit and capable parents. The Guam study, as well as Mary and Pulani's testimonies, show a deep care by Mary for her children. The older child is enrolled in school and is actively involved in cultural programs, indicating that Mary is providing educational and emotional support. Through the child support

ORIGINAL

payments and additional contributions from Pulani and her mother, Mary appears to be able to financially support the children.

Similarly, the Colorado study concluded that Allain is able to provide a suitable, loving home for the children. Allain displayed concern regarding his children's well-being and sadness at not having been a part of their lives. Although Allain has been unable to assist in the rearing of his children for the last several years, his close relationship with both his biological daughters and stepdaughters indicates he is a good father.

While the parties can each provide a loving environment for the children, the Court finds that their contentious history and ongoing disputes render them incapable of carrying out a co-parenting relationship. Since the parties' annulment, Mary has accused Allain of various harms. Her allegations of sexual abuse were determined by the military to be unfounded. The Court also could not find credible her allegation of any physical or sexual abuse by Allain upon the children.

Moreover, while Allain largely fails to communicate with Mary, her communications directed at him exhibit hostility. Concerning C.X.M.R.'s name change, Mary's email to Allain shows that she changed the daughter's name as a form of retribution stemming from the annulment: "I'm removing you from their birth certificate cause you annulled the marriage. Changing their[] names. Starting with [C.X.M.R.] she's going to have another name. . . . Because you were a bitch about sending [C.X.M.R.'s] birth certificate and social security card I'm not going to tell you her new name. I'll make you look for it." Ex. 1. She once also posted a message directed at Allain, entitled "LGBT pride month for [L.R.M.R.]" and attaching a photo of four-year-old L.R.M.R. wearing a dress. Ex. 11. The message stated, "Allain always said if his son ever wears a dress he will slap them for making his wear one. Well here's evidence he's wearing a dress and loving it. Come slap me." Ex. 11.



On Allain's part, he attributes his shortened military career to Mary's domestic violence accusation and constant contact of his superior officers. Mary's contacting of superior officers has now extended to Allain's wife and her command, which reinforces Allain's hesitancy to have any communication with Mary.

Additionally, the parties' failure to have any form of civil communication impacts their children. For example, the no-contact order prevented Allain from contacting Mary, but also had the impact of preventing him from contacting his young children. Although Mary alleges the no-contact order no longer applied once Allain left the military, Allain still has concerns about engaging the children through Mary given her prior accusations against him. Moreover, regarding in-person visitation, since Allain relocated to South Korea, he has only been able to minimally exercise in-person visitation with the children with January 2020 being his last visit. Finally, Allain has attempted to use apps to communicate with his children, but Mary has not responded to facilitate that communication. *See, e.g.,* Ex. 46.

As both parents exhibit hostility towards each other and an inability to work together for the children's best interests, the Court finds that a joint legal or physical custody arrangement will be detrimental to the children. In the Court's goal to find an environment that serves the best interests of the children, the Court recognizes the love that both parents have for their children along with the caring home environment each party provides. However, the Court foresees that this toxic relationship, if continued, will impact the children as they move beyond their toddler years. In reaching this decision, the Court considered the potential for a year-on/year-off custody arrangement. However, based on Mary's prior interference with Allain's visitation, the Court believes the parties' negative relationship would prevent Allain from having any communication with the children while they are in Mary's custody. Moreover, an annually alternating arrangement


ORIGINAL

would result in the Court's continued involvement in the custody of the minors as conflicts are likely to arise regarding child support, medical care, visitation, schooling, upbringing, and potentially even further allegations of abuse. As both parties are not without their faults, the Court must decide which one is better suited to raise the children.

### 3. It is in the best interests of the children to be placed with Allain.

#### a. Allain

The Court sees four primary issues that need to be addressed when examining Allain's parental fitness: abuse accusations, OHA fraud, child support, and visitation. First, although Mary has repeatedly accused Allain of abusing both her and L.R.M.R, on the occasions where the accusations have been investigated, they have been determined to be unfounded. The military investigation conducted regarding Mary's domestic violence accusations found no probable cause and noted the photos provided by Mary could be located on the internet. Moreover, Mary's admission to previously making false rape allegations, combined with the conclusion by the military during its investigation into Allain's alleged abuse, impacts her credibility.

Similarly, the Court doesn't fully understand how Allain holding L.R.M.R. upside down qualifies as abuse. Additionally, Mary's accusations that Allain sexually abused L.R.M.R. also appear to be unfounded. Besides Allain's denial, the pediatrician concluded that there was no evidence of sexual abuse.

The Court next looks at the OHA fraud committed by Allain. Unlike the abuse allegations, Allain was disciplined by the military for committing OHA fraud and required to repay the monies defrauded from the U.S. Government. Fraudulent behavior such as this is concerning. However, he was disciplined for his actions and recognized their wrong during this hearing.

ORIGINAL

Finally, the Court reviews the issue of child support and visitation. Despite Mary's accusations that Allain has failed to pay child support, the Child Support Referee has repeatedly stated that child support has been paid by Allain, or in instances where child support is not paid in full, the Referee has provided that the issues with payment are beyond Allain's control. With visitation, Allain's failure to fully exercise visitation, as explained above, is the result of Mary's lack of facilitation and his fears and concerns in contacting Mary in any way. Based on the testimony provided regarding visitation and the couple's history, the Court believes Allain's lack of visitation with the children does not show a lack of care for the children or poor parenting. It merely highlights Mary's lack of facilitation and the parties' inability to coparent or communicate.

**b. Mary**

Turning to Mary, the Court sees the following as the primary issues: false accusations of abuse, untruthful statements, serious medical concerns regarding the children, and the concerning email sent to Allain's superior officer. As briefly discussed above while discussing Allain, Mary has brought various accusations against Allain; all accusations that have been investigated have been found to be untrue. Similarly, Mary previously accused E.P. of rape which she testified was false. This shows a concerning pattern by her of making false allegations of atrocious acts— primarily targeted at Allain.

Similarly, Mary has made various other untruthful statements in relation to this proceeding. This case was initially filed as a Complaint for Annulment because Mary misrepresented to Allain that she had divorced Joe, even though she was still married. Similarly, during the proceeding before the Child Support Referee, the Referee determined that Mary falsely alleged that Allain failed to pay child support.

ORIGINAL

But amongst all of these acts, the most concerning involve Mary's behavior on various medically-related issues. Mary alleged L.R.M.R. was in the hospital attached to a ventilator, and she was executing a DNR. The image shared of L.R.M.R. in this condition was not, in fact, L.R.M.R. but an image extricated from the internet. Similarly, Mary has falsely publicized that C.X.M.R. has leukemia. In connection with those posts appear to be pleas for assistance from friends and family, including statements that they were traveling to the mainland for medical care or asking for information about hospitals in Texas. C.X.M.R. has not been diagnosed with leukemia, and Mary was unable to produce any medical evidence providing a basis for this statement. It is alarming to this Court that Mary would fabricate that the children suffer from serious medical conditions and would mislead, her friends and her family Allain on issues regarding the children's medical conditions. Mary has made no reasonable explanation for this conduct, and the Court struggles to believe any rationale exists. Mary's conduct in making false medical claims involving life-threatening illnesses overpowers any other evidence that tends to show her to be a loving and capable mother.

Additionally, based on her allegations that Allain sexually or physically abused L.R.M.R., Mary received two referrals to behavioral specialists dating back to 2020. But instead of following through with the referrals, Mary believes she can address L.R.M.R.'s behavior on her own. It confounds the Court that Mary would bring her child for medical attention, ignore the medical advice, claim she can be a better treatment provider, and yet, three years later, continue to insist that the child suffers from trauma. Mary claims that she distrusts doctors. However, given her accusations that the children suffer from serious illnesses and need hospital care, the Court is instead inclined to believe that she did not take L.R.M.R. to a behavioral specialist because L.R.M.R.'s alleged symptoms were not real.



Finally, the Court addresses the concerning October 20, 2020 emails stating "I might well take my life and my children for justice will never come." The emails are concerning on many levels, even though Mary attests she had no intention to harm her children. The emails were sent in response to her perceived failure of the military justice system. Based on Mary's record of making false statements, the Court views this email as a dramatization for attention in an attempt to gain sympathy from the Army and to bolster her abuse allegation and attempt to execute vengeance against Allain for seeking an annulment.

### c. Analysis of Placement with Allain or Mary

Upon reviewing the issues associated with each parent and the factors for consideration in determining the best interests of the children, the Court finds it is in the best interests of the children to be placed with Allain. While both parents have made immoral decisions, Allain's OHA fraud was a singular incident, while Mary has repeatedly lied to both the Court, Allain, and the military. Similarly, Mary has falsely stated various physical health issues plaguing the children and failed to provide treatment, despite referrals from doctors, for L.R.M.R. The Court recognizes that Mary provides a loving home for the children, but their safety is not guaranteed in her care. In placing the children, the Court focuses on their safety as a safe home environment is in their best interests, and the Court finds no safety concerns in placing the children with Allain. Based on this information, the Court believes it is in the best interests of the children to be placed in Allain's sole physical and legal custody.

The Court understands how hard this decision will be for Mary, who has dedicated her life to the children since their birth. The Court does not make this decision easily, but is persuaded by the overwhelming evidence that Mary has threatened the lives of her children, fabricated their illnesses, and falsely accused Allain of abuse. The Court also recognizes that the children have

long been deprived of the opportunity to spend time with their dad and the early stages of this transition will likely be difficult as they are taken away from their primary caregiver and moved to a new environment. However, the Court is confident that the children will become part of Allain's family and receive the love and care they need in a safe environment.

### 4. Mary may exercise limited visitation as determined by Allain.

Next, the Court must determine what visitation structure is in the best interests of the children. Based on Mary's constant contact with the military and accusations when she does not receive what she wants, the Court is hesitant to set a fixed visitation schedule out of concern for the actions that may be made by Mary should Allain be unable to facilitate a visitation. Decreasing the involvement of law enforcement authorities, military commands, and the courts in issues regarding the children is in their best interests as a sense of security is necessary for the children. Therefore, the Court determines that Allain, as a fit parent, shall determine the visitation schedule. Additionally, based on the extent of Pulani's care and love for her siblings, the Court encourages Allain to find a way to help maintain this bond.

### B. Contempt of Court

The Court now turns to its analysis to Allain's Motion for Contempt. The elements of contempt are: (1) a valid order, (2) knowledge of the order, (3) ability to comply with the order, and (4) willful failure to comply with the order. *Lamb v. Hoffman*, 2008 Guam 2 ¶ 44.

The Court issued an order on April 29, 2021 requiring Mary to restore C.X.M.R.'s name to her original name. Mary was served with this Order. However, C.X.M.R.'s name has not been restored to date. However, Mary testified that she was unable to restore C.X.M.R.'s name as the order issued by the court only used C.X.M.R.'s initials. The Court understands how this could pose an issue. The Count finds that Mary was unable to comply with the order and did not willfully fail

ORIGINAL

to comply. Therefore, the Court declines to find Mary in contempt of court. Further, as the Court has granted Allain sole physical and legal custody, the Court no longer requires Mary to change C.X.M.R.'s name. The Court will issue an order under seal containing the necessary information for the name change, and Allain may update the record with the Department of Health and Social Services when he returns to Guam to collect the minors.

## IV.    CONCLUSION AND ORDER

The Court GRANTS Allain sole legal and physical custody. Mary is entitled to visitation with the children on a schedule to be determined by Allain. Concurrently with this Decision and Order, the Court will issue a Temporary Custody Order which require DPHSS' Child Protective Services to remove the children from Mary's custody. The Court ORDERS Allain to return to Guam as quickly as possible to retrieve the children from CPS, and to report to this Court within fourteen days of this Decision and Order of his progress in retrieving the children. Further, the Court ORDERS the termination of Child Support effective from the date of this Order.

The Court ORDERS Allain to arrange a psychological evaluation to be conducted for L.R.M.R. If a treatment plan is provided, the Court ORDERS Allain to ensure it is completed. The Court ORDERS the GAL to monitor Allain's compliance in having L.R.M.R. evaluated. Within six months of this Decision and Order, the Guardian Ad Litem shall report on L.R.M.R.'s updated medical and psychological condition.

The Court DENIES Allain's Motion for Contempt, and ORDERS Allain to update C.X.M.R.'s name with the Department of Public Health and Social Services upon his return to Guam to retrieve the children. The Court will issue an Order under seal with the necessary name change information.

ORIGINAL

Finally, the June 12, 2023 Sealed Order and the June 12, 2023 minutes are hereby unsealed.[6]

SO ORDERED 14 June 2023.

THE HONORABLE ELYZE IRIARTE
Judge, Superior Court of Guam

---

[6] On June 12, 2023, the Court issued a sealed order regarding its discussions with DPHSS BOSSA Patricia Mafnas, Acting Chief, and Crystal Gooden, Service Supervisor, to inform them of the Court's intent to temporarily place the parties' minor children in the custody of DPHSS. Due to failure by the clerk's office to follow the Court's instructions, the Sealed Order was immediately served upon the parties via email. Despite its title, the Sealed Order was never sealed.

ORIGINAL